Filed 11/21/25 P. v. Vargas

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>GEOVANNY ANTONIO VARGAS,<br><br>    Defendant and Appellant. | B337021<br>(Los Angeles County<br> Super. Ct. No. BA336486) |

APPEAL from postconviction order of the Superior Court of Los Angeles County, Renee F. Korn, Judge. Affirmed.

Shay Dinata-Hanson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Kenneth C. Byrne, Supervising Deputy Attorney General, and Allison H. Chung, Deputy Attorney General, for Plaintiff and Respondent.

Defendant and appellant Geovanny Antonio Vargas appeals from the denial of his Penal Code section 1172.6 petition following an evidentiary hearing.[1]  Defendant challenges the sufficiency of evidence supporting the court's finding that he directly aided and abetted murder with express and implied malice.  Defendant also requests that we remand the matter to consider his youthfulness.  We affirm.

## FACTUAL AND BACKGROUND[2]

### A.    Trial Evidence

In 2008, defendant (25 years old) and Lester Galdamez (18 years old) were members of the St. Andrews Boys 13 gang (St. Andrews gang).  The victim in this case, Gerardo Canenguez, was a 19-year old member of the Mara Salvatrucha 13 gang (M.S. gang).

#### 1.    *Gang Evidence*

Los Angeles Police Department Officer Lazaro Ortega, a gang and narcotics officer with over 11 years of experience, testified as an expert on criminal street gangs.  At the time of

---

[1]    Subsequent unspecified references to statutes are to the Penal Code.

[2]    By separate order, this court granted the People's request to take judicial notice of the prior appellate records in *People v. Geovanny Antonio Vargas et al.* (Nov. 20, 2012, B234354) [nonpub. opn.] (*Vargas I*) and *People v. Vargas* (June 27, 2022, B309389) [nonpub. opn.] (*Vargas II*).  We deny as duplicative defendant's motion to augment the record with portions of the appellate record in *Vargas I*.

The parties recite the underlying facts from the prior appellate opinions.  We also recite the factual background from those decisions with additional facts taken from trial testimony and evidence.

2

Canenguez's shooting, the St. Andrews and M.S. gangs were at "war" and used graffiti to claim overlapping territories. Any act of a rival who "comes in your neighborhood and starts crossing [ ] out" St. Andrews gang graffiti would be confronted with "extreme violence." Senior members of the St. Andrews gang who accompany junior members during shootings would be expected to "watch the younger gang member's back" and "make sure things get done right."

The shooting of Canenguez occurred at the intersection of Clinton Street and Wilton Place in the City of Los Angeles.

2.  *The Shooting of Canenguez*

Around 11:25 a.m. on February 14, 2008, Juan Diaz was working on the third floor of a building near the intersection of Clinton Street and Wilton Place. Diaz's employee called his attention to "screaming or somebody [ ] talking really loud" on the street. As he walked to an outdoor balcony, Diaz heard a gunshot and saw two men standing behind the front right bumper of a parked van. One of the men fired three shots across the intersection at a boy sitting on a bicycle. The man standing "right next" to the shooter "didn't look . . . scared or in shock or anything." Another person standing near the boy ducked behind a car, retrieved a gun from his waistband, and returned gunfire across the street. "Together," the first shooter and his companion ducked behind the van before walking away. The second shooter looked down at the boy, shook his head, and walked away.

Richard Slozak was in his parked truck on Clinton Street when he heard gunfire and saw two men move briskly across the street and between cars. Sandra Copeland was also near the intersection in a vehicle when she heard several gunshots and

3

saw a boy on a bicycle fall to the ground. Copeland did not see the boy shout or threaten anyone before the shooting. Copeland called 911. Another witness, Rodolfo Castanon, saw two men running away from the shooting. Castanon described the men to a 911 operator as he followed them to a building on Norton Avenue.

Around 12:00 p.m., Edward Chang, another known St. Andrews gang member, called Liliana Yoon and asked her to park her car behind an apartment building on Van Ness Avenue. When she arrived, Galdamez climbed out of a trash dumpster and into the trunk of Yoon's car. Yoon followed another car driven by Chang for several minutes. When both stopped on the side of the road, Galdamez emerged from Yoon's trunk and told Chang and another St. Andrews gang member he "caught" the "enemy," two M.S. gang members, "one walking and one on like a bike," and "blast."

At the intersection of Clinton Street and Wilton Place, police officers located Canenguez's body, a bicycle, and several bullet casings. Officers noticed several pieces of St. Andrews gang graffiti several city blocks away had been freshly "crossed out by M.S." with black spray paint. Medical personnel recovered a black spray paint can and pocketknife from Canenguez.

3. *Defendant's Arrest and Recorded Conversation*

Defendant was detained inside his mother's residence at the Norton Avenue building identified by Castanon.[3] There, officers found a semiautomatic handgun later determined to have

---

[3] According to defendant, his mother's residence was "about a block away" from Galdamez's apartment.

fired bullet casings recovered from the intersection. Galdamez was a contributor of DNA found on the firearm.

Following his arrest, defendant was placed in a room with Javier Plascencia, another member of the St. Andrews gang detained on Norton Avenue after the shooting. Out of the officers' presence, defendant told Plascencia about the shooting in a recorded conversation that was played for the jury.

Defendant told Plascencia he was inside Galdamez's apartment sleeping when Galdamez woke him up and got "his shit . . . ."[4] Galdamez "voiced [ ] out" defendant after his "fucking neighbor called" him. Defendant "was like, 'Oh, man.' Let's go out . . . we were going to go down to like the commons, but instead of going to the commons we stayed on the block (inaudible)… couple of these [people] drive by on bikes…."

While outside, "We [(defendant and Galdamez)] fucking seen 'em riding bikes . . . ." The people they spotted "went around and [Galdamez] went out into the middle of the block … (inaudible) seen him riding a bike … He ran up and fuck." One person was shot in the head. Defendant started "boogying" with Galdamez trailing behind. Galdamez called out, "'Geo, Geo'" and "wait[ed] back for his ass" while telling him "'hurry up fool man'" and "'come on fool.'" They ran down Van Ness, turned onto his mother's block, and stayed by her house. Galdamez handed defendant the firearm that was later recovered.

4.    *Defense Evidence*

Defendant testified the shooting happened as he accompanied Galdamez on the street "to go skate[boarding]."

---

[4]    In context, an investigating officer believed the word "shit" referred to a gun.

5

Defendant did not know Galdamez carried a gun.  While approaching the intersection, one of two men dismounted a bicycle and pulled out a gun.  Defendant and Galdamez ran as the man fired shots at them.

On cross-examination, defendant admitted he initially told police he "wasn't even there" during the shooting and changed his account when confronted with the recovered firearm.  Defendant never told police "some guys rushed up to us" or shot at them while running away.  If St. Andrews gang members "were crossing out" M.S. gang graffiti, he would expect its members to "try to kill us or hurt us."  He expected St. Andrews gang members to do the same to M.S. gang members under the same circumstances.

## B.  Information, Instructions, Verdicts, and Sentence

By amended information, defendant and Galdamez were charged with the murder of Canenguez (§ 187, subd. (a)) with gang (§ 186.22, subds. (b)(1)(C), (b)(4)) and firearm (§ 12022.53, subds. (b)–(e)(1)) enhancement allegations.  As to the underlying offense, the jury received instructions on direct aiding and abetting, the natural and probable consequences doctrine, express and implied malice, and premeditated first degree murder.  (CALCRIM Nos. 400–401, 403, 520–521.)

The jury found defendant and Galdamez guilty as charged, found the murder was of the first degree, and found the gun and gang allegations true.  Both were sentenced to 50 years to life.

## C.  Direct Appeal (*Vargas I*)

Defendant and Galdamez appealed the underlying judgment.  (*Vargas I*, *supra*, at p. 1.)  In relevant part, they

argued the court erred by permitting the prosecutor to ask Ortega two hypothetical questions.

The first question asked, "'[H]ypothetically speaking, if you had a [M.S.] associate or gang member going into St. Andrews territory and he starts crossing [their graffiti] out . . . , what would you expect St. Andrews gang members to do if they were notified [that] someone is doing this out there?'" Ortega replied, "'Immediately go out there and confront [the individual with] extreme violence. . . .'" (*Vargas I*, *supra*, at p. 18.)

The second asked, "'If a St. Andrews gang member were to be notified that someone is crossing [their graffiti] out, grabs a gun and goes with another St. Andrews gang member to confront that rival, is there an expectation that someone could die and that the gun he's taking may have to be used?'" Ortega responded, "'Of course.'" (*Vargas I*, *supra*, at p. 18.)

A different panel of this court rejected the contention, finding "the evidence as a whole supports the inference that the call [to Galdamez] alerted [him and defendant] that someone was crossing out St. Andrews gang graffiti. The recording shows that Galdamez received a phone call at his home, 'got his shit,' and left with [defendant]; in addition, there was evidence that Canenguez had been obliterating St. Andrews gang graffiti with black spray paint before Galdamez shot him. In view of the recording and the other evidence, the jury reasonably could have inferred that Galdamez armed himself and recruited [defendant's] assistance because the phone call described Canenguez's activities." (*Vargas I*, *supra*, at pp. 20–21.)

7

**D. Resentencing Petition and Prior Appeal (*Vargas II*)**

In March 2019, defendant filed a form resentencing petition under former section 1170.95 (now section 1172.6), alleging he was convicted under the natural and probable consequences doctrine. In *Vargas II*, a different panel of this court reversed the summary denial of his petition, finding the jury instructions and closing argument "were ambiguous regarding whether [defendant] could be convicted of first degree murder under the natural and probable consequences theory." (*Vargas II*, *supra*, at pp. 1, 4.) The court reversed the order. (*Ibid.*)[5]

**E. Remand, Evidentiary Hearing, and Order Denying Petition**

On remand, the trial court issued an order to show cause, appointed counsel, and received additional briefing by the parties. Following an evidentiary hearing, the court issued a 16-page decision denying defendant's petition.

Under recent caselaw (e.g., *People v. Curiel* (2023) 15 Cal.5th 433 (*Curiel*); *People v. Reyes* (2023) 14 Cal.5th 981 (*Reyes*); *People v. Gentile* (2020) 10 Cal.5th 830 (*Gentile*)) and recently amended CALCRIM No. 526 (as amended Sept. 2023)), the court found defendant "guilty beyond a reasonable doubt as

---

[5]    In its own review of the trial record, the *Vargas II* court found "the jury reasonably could have concluded the evidence proved [defendant] intended to aid and abet an assault (the natural and probable consequences of which was murder), but failed to prove beyond a reasonable doubt he intended to kill." (*Vargas II*, *supra*, at p. 12, fn. 8.) "We need not decide the issue, [however,] as the Attorney General does not argue that the trial evidence failed to support the natural and probable consequences theory, or that such a failure . . . would establish the jury rejected the theory." (*Ibid.*)

[to] express and implied malice" murder as an aider and abettor who assisted Galdamez in "looking to shoot the rival gang member who had crossed out St. Andrews gang graffiti," confronting the rival gang member, and fleeing with Galdamez "together for several blocks until codefendant gave [defendant] the gun." The court found many of defendant's statements at trial not credible.

## DISCUSSION

### A.     Governing Law and Standard of Review

In January 2019, the Legislature "'amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.'" (*Curiel*, *supra*, 15 Cal.5th at p. 448, quoting Stats. 2018, ch. 1015, § 1(f).) The Legislature also added former section 1170.95, now section 1172.6, for individuals convicted of felony murder or murder under the natural and probable consequences doctrine to seek retroactive relief by petition to the trial court. (§ 1172.6, subd. (a).)

If a petitioner makes a prima facie showing of entitlement to section 1172.6 relief, the court must issue an order to show cause and hold an evidentiary hearing at which the prosecution bears the burden "to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder" under current law. (§ 1172.6, subds. (c), (d)(3)). At the hearing, the trial court acts as an independent factfinder and may consider previously admitted evidence that is admissible under current

9

law, or any new or additional evidence submitted by the parties. (§ 1172.6, subd. (d)(3).)  The court "must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard . . . ." (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.)

We review the trial court's denial of a section 1172.6 petition following an evidentiary hearing for substantial evidence.  (*Reyes*, *supra*, 14 Cal.5th at p. 988.)  We review the record in the light most favorable to the judgment to determine whether evidence that is reasonable, credible, and of solid value supports a reasonable finding of guilt beyond a reasonable doubt. (*People v. Westerfield* (2019) 6 Cal.5th 632, 712.)  In doing so, we resolve neither credibility issues nor conflicts in the evidence. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

## B.    Substantial Evidence Supports Aiding and Abetting Murder

Defendant contends there is insufficient evidence he aided and abetted the murder with express or implied malice.  We disagree.

Murder is the unlawful killing of a human being with malice aforethought, which "may be express or implied."  (§§ 187, subd. (a), 188, subd. (a).)  "Guilt as an aider and abettor is 'based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state.'" (*People v. Powell* (2021) 63 Cal.App.5th 689, 710.)

Express malice is the manifestation of intent to kill.  (§ 188, subd. (a)(1).)  Malice is implied when no considerable provocation appears or when the circumstances attending the killing show an

10

abandoned or malignant heart. (§ 188, subd. (a)(2); see *People v. Soto* (2018) 4 Cal.5th 968, 976 ["[t]he primary difference between express malice and implied malice is that the former requires an intent to kill but the latter does not"].)

When a person "directly aids and abets a murder, the aider and abettor must possess malice aforethought." (*Gentile*, *supra*, 10 Cal.5th at pp. 844–845.) For first degree murder, the aider and abettor must also act "'willfully, deliberately, and with premeditation . . . .'" (*In re Lopez* (2023) 14 Cal.5th 562, 579; *People v. McCoy* (2001) 25 Cal.4th 1111, 1118.) For second degree murder, "'[t]he mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.'" (*Reyes*, *supra*, 14 Cal.5th at p. 991.)

Conduct that aids and abets a crime must assist its achievement. (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.) For implied malice murder, such conduct must attend "'the life-endangering *act*, not the result of that act.'" (*Reyes*, *supra*, 14 Cal.5th at p. 991.) If, as here, the life-endangering act is a shooting, the aider and abettor must know the shooter "intended to shoot at the victim, intended to aid him in the shooting, knew that the shooting was dangerous to life, and acted in conscious disregard for life." (*Id.* at p. 992.) Various factors bear on aiding and abetting, including "'presence at the scene of the crime, failure to take steps to attempt or prevent the commission of the crime, companionship, flight, and conduct before and after the crime.'" (*People v. Garcia* (2008) 168 Cal.App.4th 261, 273.)

11

The evidence in this case supports each of these factors. Beginning with context, Canenguez's shooting involved members of rivaling, at "war" gangs over territory in which the victim was killed.  (See *People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 772 [""""evidence of [a] gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like""" are probative of """"guilt of the charged crime""" as to "motive, and intent to kill"]; *People v. Sandoval* (1992) 4 Cal.4th 155, 175 ["battle over turf"].)

In this context, the facts reasonably evince planning and confrontation by defendant and Galdamez of those responsible for crossing out their gang's graffiti.  Galdamez received a phone call prompting him to wake up defendant, arm himself, and travel to territory over which the gangs were at war.  (See *Vargas I, supra*, at pp. 20–21.)  There, Galdamez "caught" a rival M.S. member and "blast[ed]" him in the street.  (See *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1370 [discovering who crossed out gang graffiti and violent reaction thereto is probative of motive and intent].) Defendant, a more senior gang member, stood next to Galdamez in no apparent shock or fear as he fired shots at Canenguez. Defendant's concerted actions with Galdamez "reasonably implies a common purpose, . . .  Since there is no evidence he was surprised by [Galdamez's] conduct or afraid to interfere with it, the [court] could reasonably conclude" defendant assumed his position to "watch out for others who might approach.  Such conduct is a textbook example of aiding and abetting." (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409.)

After the shooting, defendant fled with Galdamez, encouraged him to run, and hid the murder weapon inside his mother's residence.  Defendant then provided conflicting accounts

of the shooting to police. (See *People v. Lara* (2017) 9 Cal.App.5th 296, 322 & fn. 16 [false statements to authorities and conduct after offense].) From this conduct, the court could reasonably infer defendant shared an intent to kill Canenguez, encouraged and facilitated the shooting, and assisted Galdamez in its aftermath. (See *People v. Maury* (2003) 30 Cal.4th 342, 396 [reviewing courts "must accept logical inferences" drawn from circumstantial evidence].)

This case is like *People v. Nguyen* (2015) 61 Cal.4th 1015. There, Nguyen and other members of his gang were in a car that fired shots at another car carrying rival gang members. (*Id.* at pp. 1026–1027, 1053–1054 [the gangs "were in a state of war"].) Moments before the shooting, Nguyen and his companions looked out towards the victim's car. (*Ibid.*) After a few blocks, the two cars stopped at a light next to one another. The shooter, from a seat in front of Nguyen's, fired shots at the driver of the second car. (*Id.* at pp. 1027, 1053–1054.) In this situation, a gang expert testified that a non-shooting gang member "'would be expected to back [the shooter] up. Be it assault somebody, be it shoot somebody, be it take over the driving of the vehicle, whatever it may be.'" (*Id.* at p. 1054.) These facts established reasonable inferences that Nguyen knew of the shooter's intent, shared that intent, and aided and abetted the shooter by spotting potential targets. (*Id.* at p. 1055.)

Likewise here, a factfinder could reasonably infer defendant knew Galdamez intended to shoot Canenguez, a rival gang member, shared that intent, and assisted in the shooting by assisting Galdamez in identifying a rival gang member "riding bikes" near their gang's graffiti. (See also *People v. Glukhoy*

13

(2022) 77 Cal.App.5th 576, 599 [similar presence at scene, companionship, conduct before and after, and motive].)

Resisting this conclusion, defendant analogizes the facts of this case to those in *Reyes*, *supra*, 14 Cal.5th 981. But the *Reyes* Court did not analyze the sufficiency of evidence of aiding and abetting; it remanded the matter for an evidentiary hearing because "the trial court's findings rested on an error of law." (*Id.* at pp. 990, 992 ["express[ing] no view on the merits" of sufficiency claim].) The trial court here made no error of law. In express reliance on *Reyes*, it analyzed defendant's mental state and actions.

In sum, we conclude substantial evidence supports the finding beyond a reasonable doubt that defendant knew Galdamez intended to shoot, intended to and in fact aided him in the shooting, knew the shooting was dangerous to life, and acted with the intent to kill and in conscious disregard for life.

## C. No Remand for Youthfulness Consideration

Next, defendant contends the trial court erred by failing to consider his youthfulness when analyzing his mental state under aiding and abetting principles. (Citing *People v. Jimenez* (2024) 103 Cal.App.5th 994, 1000, 1006 (*Jimenez*) [remanding 1172.6 denial to consider effect of defendant's youthfulness on implied malice]; *People v. Harris* (2021) 60 Cal.App.5th 939, 960 [same as to major participation in felony murder].)

Defendant never asked the trial court to consider his youthfulness. "A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*People v. Partida* (2005) 37 Cal.4th 428, 435.) Defendant has forfeited this contention on appeal

14

Resisting forfeiture, defendant notes "changes in the law regarding whether and how . . . an adult offender's youth" bears on a malice determination.  All but one of the cases he cites were published before his January 2024 evidentiary hearing.[6]  Even though defendant did not raise his age below, the court acknowledged it at the evidentiary hearing and in its written memorandum that defendant was 25 and senior to Galdamez, who was 18, at the time of the murder.  We presume the court considered defendant's age when analyzing express and implied malice.  (See *People v. Stowell* (2003) 31 Cal.4th 1107, 1114 [on a silent record, "a reviewing court will presume the trial court had a proper basis for a particular finding"].)

Assuming the trial court was required to consider defendant's youth and failed to do so, defendant has not shown how that failure was prejudicial.  (See *Jimenez*, *supra*, 103 Cal.App.5th at p. 1007 [applying *Watson* standard]; *People v. Coley* (1997) 52 Cal.App.4th 964, 972 [appellant must demonstrate prejudice].)  Defendant, a 25-year-old adult and senior member of the St. Andrews gang, supported a junior member in a premeditated killing of a rival.  "[T]he presumption of immaturity weakens as a defendant approaches 26.  More importantly, however, the case law discussing differences in brain development among youthful offenders (in contrast to their adult counterparts) stress two areas of divergence:  (1) their

---

6       E.g., *People v. Pittman* (2023) 96 Cal.App.5th 400, 416; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 990–991; *In re Moore* (2021) 68 Cal.App.5th 434, 454–455; see also *People v. Hardin* (2024) 15 Cal.5th 834, 845–846 [noting legislative consideration of scientific evidence that brain development on judgment "continues beyond adolescence and into the mid-20's"].

relative impulsivity; and (2) their vulnerability to peer pressure." (*People v. Oliver* (2023) 90 Cal.App.5th 466, 489.) Beyond noting his age, defendant presents no developed analysis on these factors. (See *People v. Mitchell* (2022) 81 Cal.App.5th 575, 595 ["The fact of youth cannot overwhelm all other factors"].)

## DISPOSITION

The postconviction order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MORI, J.

We concur:

ZUKIN, P. J.

TAMZARIAN, J.